# In the United States Court of Federal Claims

No. 11-606C
(Filed February 22, 2012) 1/

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * | * | |
| | * | |
| **GTA CONTAINERS, INC.,** | * | Post-award bid protest; 28 |
| | * | U.S.C. § 1491(b)(1) (2006); |
| Plaintiff, | * | material misrepresentation; 28 |
| | * | U.S.C. § 1491(b)(3), interests of |
| v. | * | national defense and national |
| | * | security. |
| **THE UNITED STATES,** | * | |
| | * | |
| Defendant, | * | |
| | * | |
| and | * | |
| | * | |
| **J.G.B. ENTERPRISES, INC.,** | * | |
| | * | |
| Defendant-Intervenor. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * | * | |

Scott E. Pickens, Washington, DC, for plaintiff. Karen A. McGee, Barnes & Thornburg LLP, of counsel.

Michael S. Macko, Washington, DC, with whom was Assistant Attorney General Tony West, for defendant. Elliot S. Avidan, U.S. Marine Corps, Quantico, VA, of counsel.

Joseph A. Camardo, Jr., Auburn, NY, for defendant-intervenor. Kevin M. Cox, Camardo Law Firm, P.C., of counsel.

---

1/ This opinion was originally filed under seal on February 8, 2012. The parties were requested to notify the court of any redactions. Defendant did not request any redactions, and plaintiff only requested three, which have been implemented. Intervenor's requested redactions, although extensive, have been implemented.

**MEMORANDUM OPINION AND ORDER REPLACING ORDER ON
PERMANENT INJUNCTION AND ORDER FOR ENTRY OF JUDGMENT
ENTERED ON JANUARY 26, 2012, REISSUED FOR PUBLICATION ON
FEBRUARY 6, 2012**

**MILLER**, Judge.

        This post-award bid protest is before the court after argument on the parties' cross-motions for judgment on the administrative record. The issues presented have been refined up to the last minute because the military has twice taken corrective action to delimit the scope of the contract under which it is placing an order for emergency procurement. The Government's evolved position is that the military canceled the solicitation and that the procurement vehicle is an emergency order to fill military exigencies without which troops would be imperiled and has nothing to do with the defunct contract. The protester insists that the awardee is in the position of filling an emergency order only because the military originally awarded the contract based on a material misrepresentation. The awardee-intervenor maintains that the protester lacks standing or would not be prejudiced by an award because the military questioned the protester's ability to perform the scope of work under the solicitation. On January 26, 2012, the court granted permanent injunctive relief, entered an order setting forth its findings and legal analysis, and directed entry of judgment for plaintiff. The court advised that it would file by February 3, 2012, an opinion more fully addressing the parties' contentions. This opinion fulfills that objective, if not the ambitious time frame for delivery.

**FACTS**

I.  The Solicitation

        The factual recitation is drawn from the administrative record, as supplemented. This case concerns an attempted procurement of water and fuel systems by the Marine Corps Systems Command (the "MCSC" or the "Corps") in order to maintain the supplies—and combat readiness—of the Marine Expeditionary Forces. On February 18, 2011, the MCSC issued Solicitation M67854-11-R-5030 (the "Solicitation") seeking competitive proposals for the provision of Tactical Fuel Systems ("TFS") and Water Supply Support Equipment ("WSSE"), collectively referred to by the MCSC as Tactical Fuel and Water Systems ("TFWS"), and their individual component parts. AR 358. The MCSC sought to award a firm-fixed price requirements contract to span one base year and four option years with a $99,000,000.00 ceiling. Id. The Solicitation informed potential offerors that the awardee would be responsible for procuring, packaging, and shipping specified water- and fuel-storage systems and their component parts. Id. at 1622. The Solicitation was to be a 100

2

percent small-business set aside, and it incorporated the procedures for acquisition of commercial items located in Federal Acquisition Regulation ("FAR") Part 12, 48 C.F.R. Part 12 (2011). Id. at 358. The initial due date for proposal submissions was set as March 18, 2011, which later was extended to April 15, 2011. Id. at 358, 1342.

The administrative record discloses that the MCSC intended to make a single award based on overall "[b]est [v]alue" to the MCSC. Id. at 1293. In determining "[b]est [v]alue," the Solicitation identified three factors that would be evaluated: (1) past performance, (2) technical capabilities, and (3) price. Id. at 367. The Solicitation instructed potential offerors to submit certain information regarding these three categories, see Id. at 365, 367-68, and informed those potential offerors that "Past Performance is more important than Technical and Price. Technical is more important than Price." Id. at 367. Offerors were also alerted that initial offers "should contain the offeror's best terms from a price and technical standpoint" because the "Government intend[ed] to evaluate offers and award a contract without discussion with offerors." Id. at 363.

Regarding past performance, the MCSC required offerors to provide past performance information on "at least [two] programs underway or completed during the past [three] years as a prime or subcontractor and [two] programs underway or completed during the past [three] years by [their] subcontractors similar in content and scope to that proposed . . . ." Id. at 365. The Solicitation also incorporated FAR 52.212-2, Evaluation—Commercial Items (Jan 1999), which explained:

> The Government will evaluate how well the Offeror performed on previous relevant efforts of similar type (Tactical Fuel and Water Systems), size, and complexity. The standard is based upon the Offeror's ability to substantiate credible examples of past performance inclusive of delivery schedule compliance, quality, and overall customer satisfaction. Other relevant information submitted by the offeror will be used to substantiate credible performance.

Id. at 367.

With respect to the technical factor, the Solicitation informed offerors that "[t]he Government will evaluate the offeror's technical merit to assess its overall capability to fulfill the SOW ["Statement of Work"] requirements." Id. at 367. To this end offerors were instructed to include particular information. Offerors first were asked to describe "[t]he size and composition of the team that will be assigned to manage this task . . . [and to] [d]escribe individual qualifications and experience relevant to this task for each position." Id. at 365. Further, offerors were to describe "[a]ll teaming arrangements to include prime and

subcontractors' roles . . . [and to] [d]escribe the proposed work to be performed by you as the prime and by each individual subcontractor." Id. Offerors also were to provide, *inter alia*, "a description of the[] warranty program and process" that they intended to offer to the Government. Id. at 366.

Finally, for the pricing factor, offerors were instructed to complete a workbook of four Excel spreadsheets included with the Solicitation. Id. Each spreadsheet represented a contract line item number ("CLIN") under the Solicitation and was divided, as follows: CLIN 0001 was for the water storage systems; CLIN 0002, the components to support the water systems; CLIN 0003, the fuel storage systems; and CLIN 0004, the components to support the fuel systems. See, e.g., id. at 369-84; 391-93; 394-401; 403-06 (listing items in each of the respective CLINs). Each spreadsheet listed the specific items within that CLIN. See id. Offerors were to propose a price for each item in each CLIN in each of four quantity bands (0-10, 11-50, 51-100, and 101+). Id. at 359. The offerors were instructed to do this for each of the five specified fiscal years. Id. Predicated on this information, the pricing information would then be evaluated, as follows:

> Price information presented by the offeror will be evaluated for reasonableness. The Government will calculate an evaluated price for each Offeror's proposal by adding together all contract line item numbers (CLINs) against an evaluated quantity. The total evaluated price equates to the pricing of the CLINs presented in Attachment *5 - TFWS Pricing*. The evaluated price formula will be based on the total prices (TPs) in FY11-FY15 . . . .
>
> (a)   Price proposal for contract line item *(CLIN) 0001 WSSE Systems List tab* and *CLIN 0003 TFS Systems List* tab of Attachment 5, will be weighted 80% for purposes of total price evaluation.
>
> (b)   Price proposal for CLIN 0002 *WSSE Components List* tab and CLIN 0004 *TFS Components* List tab of Attachment 5- *TFWS Pricing*, will be weighted 20% for purposes of total price evaluation.
>
> (c)   Total Evalued [*sic*] Price: CLIN 0001 TP *.80 + CLIN 0002 TP*.20 + CLIN 0003 TP*.80 + CLIN 0004 TP* .20[.]

Id. at 367-68 (emphasis original).

The proposal submission period closed on April 15, 2011. See id. at 1342. Seven offerors submitted proposals to the MCSC, including both plaintiff, GTA Containers, Inc.

4

("plaintiff"), and defendant-intervenor, J.G.B. Enterprises, Inc. ("intervenor"). 2/ Id. at 1343-44. In its proposal intervenor included the required past performance information in section II. Id. at 1154. Intervenor indicated that "Tables 3 through 5 contain past performance data for JGB suppliers." Id. In Table 4, intervenor included past performance data for [                                        ], which indicated that [     ] had served as a previous supplier to intervenor and as a previous supplier to Defense Logistics Agency ("DLA") for components that were required by the Solicitation. Id. at 1158-59. Intervenor specifically stated that [     ] past performance included delivery of a [                   ] and indicated that [

                                                                      ]. Id. at 1158. Moreover, when describing the teaming arrangements it would use to satisfy the MCSC's needs, intervenor indicated that "JGB is the source for approximately [     ] of the part numbers required by the TFS-LS/WSSE-LS program. The remaining are produced by a variety of Original Equipment Manufacturers [("OEMs")] with whom JGB has had long and successful relationships." 3/ Id. at 1161. Intervenor also stated in its proposal that "*[t]he JGB response to the solicitation is fully compliant to all requirements*." Id. at 1153.

The MCSC evaluated the proposals from April 18, 2011, until June 13, 2011. Id. at 1342. In evaluating intervenor's proposal, the Technical Evaluation Team (the "TET") understood intervenor to be proposing [     ] as a subcontractor supplier. See id. at 1297-98. Regarding past performance—the most important factor in determining "[b]est [v]alue"—the TET assigned intervenor a [          ] rating and explained in its rationale that "[r]elevant subcontractor past performance submissions [had been] submitted substantiating credible TFS/WSSE experience." Id. at 1297. Further, the TET assigned intervenor an [          ] technical rating and noted specifically: "[t]eaming arrangements with: [

                                        ]. Proposed work by prime and subcontractors adequately

---

2/ All of the details concerning plaintiff's and intervenor's proposals need not be examined to adjudicate this dispute. Accordingly, the court will limit its discussion only to those facts regarding the proposals that are necessary to resolving the issues presented by plaintiff's protest.

3/ Intervenor previously had represented that [     ] was one of its OEMs to the MCSC in its Contractor Capability Statement submitted to Maj. Travis L. Sutton—the Contracting Officer and Source Selection Official for the procurement at issue—in response to the MCSC's Sources Sought/Request for Information. See AR 145. In response to the MCSC's instruction to "[p]rovide company name, proposed team members . . . and description of related competencies," intervenor explained that it was [

                           ]. Id.

5

addressed." 4/ Id. at 1298.  On July 6, 2011, the MCSC awarded Contract M67854-11-D-5030 (the "Contract") to intervenor.  Id. at 1376.  Concurrent with the award of the contract, the MCSC issued Delivery Order 0001 in the amount of $42,521,776.00; and on the following day, it issued Delivery Order 0002 in the amount of $4,657,341.00.  See id. at 1395-99; 1401-05.

On July 22, 2011, plaintiff protested the award to the Government Accountability Office (the "GAO").  Id. at 1587.  However, because "certain important protest issues," Compl. filed Sept. 20, 2011, ¶ 11, would not be addressed, plaintiff withdrew its protest prior to any decision from the GAO, id. at 1926.  Instead, on September 20, 2011, plaintiff filed its complaint in the United States Court of Federal Claims.  In response to this action, the MCSC voluntarily stayed performance on the contract until December 1, 2011, and the court entered a briefing schedule.  See Order entered Sept. 21, 2011, at 2.  On October 13, 2011, defendant filed notice that the MCSC intended to take corrective action by requesting a size determination from the Small Business Administration (the "SBA").  See Def.'s Notice of Corrective Action filed Oct. 13, 2011.  On October 18, 2011, the MCSC did request from the SBA a formal size determination of [      ].  See Def.'s Notice of Action Taken Pursuant to the Court's Order of Oct. 24, 2011, filed Nov. 30, 2011, at App. 2.  On October 24, 2011, this court, in accordance with the parties' joint proposal, remanded the matter to the contracting officer to allow the MCSC to take action on the size determination and stayed the court action.  See Order entered Oct. 24, 2011.

The SBA rendered its size determination on November 22, 2011.  AR 1979.  The SBA did not make an actual finding in addressing plaintiff's allegation that [      ] is a large business.  In response to SBA inquiries during its investigation, intervenor made several important representations regarding [      ].  The SBA decided that these representations obviated the need for a size determination of [      ].  In its November 7, 2011 letter to the SBA, intervenor acknowledged that it had listed information in its proposal concerning [      ] past performance.  Id. at 2127.  As explained by intervenor,

> [t]he intended purpose for including the past performance of [      ] in our proposal was to provide other relevant information as required by the proposal instructions. . . . Our intention . . . was to either manufacture this item ourselves or thru [sic] another viable small business manufacturer.  [      ] was simply listed as they are the only previous supplier of the [

---

4/ [                              ] past performance was listed in Table 3 of section II of intervenor's proposal, the table immediately preceding [      ].  See AR 1157-58.

] that we listed in our proposal.  We would only use [      ] as a technical reference point if questions arose during our assembly of the item.

Id.  In its Size Determination Memorandum dated November 22, 2011, the SBA advised the MCSC that, because intervenor "stated that it has no contractual agreements with [      ] including . . . joint venture agreements, agreements to share employees or any other agreements," and because intervenor "indicated in its response that it will not purchase any items from [      ] for this contract" and would "find alternate sources for products that it had proposed to purchase from [      ] in its proposal," the SBA did not proceed with a size determination of [      ].  Id. at 1985.

In the course of its investigation, however, the SBA discovered that intervenor had proposed to acquire certain component parts from businesses that were classified as other than small.  While examining the sources of the 524 components that were listed in the Solicitation CLINs, the SBA determined that intervenor had proposed to acquire "potentially [ ] . . . from . . . large business[es]."  Id. at 1987.  Additionally, the SBA found that one proposed component part actually was manufactured in Canada and that one proposed supplier was a non-profit organization, which the SBA noted does "not qualify as [a] small business[]."  Id.  Because of these findings, the SBA concluded, as follows:

> The Small Business Administration - Area I finds JGB to be a small business which qualifies as a kit-assembler for the contract in question, and as a nonmanufacturer for orders in which it is supplying components made in the United States by a small business.  JGB is an other than small business for all orders for which it is a nonmanufacturer and the component required is manufactured by a large business or not in the United States.

Id. at 1988.

On November 29, 2011, after review of the SBA's size determination, the MCSC decided not to disturb the contract award to JGB.  See Def.'s Notice of Action Taken Pursuant to the Court's Order of Oct. 24, 2011, filed Nov. 30, 2011, at App. 3.  The MCSC reasoned that intervenor "represented in its proposal that it will comply with all contract requirements, and the face of its proposal does not lead to the conclusion that [intervenor] will not or cannot comply with the non-manufacturer rule."  Id.  Therefore, because "[t]he face of [intervenor]'s proposal does not reflect that [          ] will be used to furnish supplies in a way that violates the non-manufacturer rule," the MCSC deemed it unnecessary to disturb the award.  See id. at App. 4.  This information was conveyed to the court on November 30, 2011.  See Def.'s Notice of Action Taken Pursuant to the Court's Order of Oct. 24, 2011, filed on Nov. 30, 2011.

In its notice of corrective action, the MCSC also stated that, having inventoried its water- and fuel-storage system items, it had "determined that it is necessary for us to begin partial performance of the contract." Id. at App. 5. To support this determination, William P. Macecevic, Jr., Program Manager for the Marine Corps Engineer Systems, submitted his declaration. See Declaration of William P. Macecevic, Jr., Nov. 29, 2011. Mr. Macecevic indicated that the inventory for fuel-storage systems and components was "critically low" and that "[s]everal Marine Corps units . . . hold stocks below the 85% of required wartime quantities . . . and are at substantial risk of being unable to perform their operational missions." Macecevic Decl. ¶¶ 6-8. Because of this shortage, the MCSC indicated that it intended to place orders on the contract to replenish those supplies that had fallen below the 85 percent threshold for military readiness. See id. ¶ 12. Plaintiff did not move to enjoin this partial performance, and on December 1, 2011, upon the expiration of the voluntary stay, the MCSC modified its initial order, Def.'s Br. filed Jan. 6, 2012, at 14, and began procurement of a number of items originally listed in Delivery Order 0001 with a total cost of $29,960,193.53, see Macecevic Decl. at Ex. 2.

On December 5, 2011, plaintiff filed a response to defendant's update, reiterating its position that the award of the contract to intervenor was improper for a number of reasons. See Pl.'s Notice Pursuant to the Court's Order of Oct. 24, 2011 and Resp. to Def.'s Nov. 30, 2011 Notice of Action Taken, filed Dec. 5, 2011, at 2-3. This court held a status conference on December 7, 2011, for the purpose, *inter alia*, of determining whether to entertain a motion for a preliminary injunction and indicated that plaintiff was likely to succeed on the merits of its misrepresentation claim. Because defendant agreed to consolidation of any request for a preliminary injunction with a hearing on the merits and final resolution of plaintiff's protest, see Transcript of Proceedings, GTA Containers, Inc. v. United States, No. 11-606C, at 27-29 (Fed. Cl. Dec. 7, 2011) ("Tr."), this court also indicated that it would not grant preliminary injunctive relief in deference to the military's assessment of urgent material needs. Subsequent to the status conference, the court ordered defendant to supplement the administrative record with the documents concerning the MCSC's and intervenor's communications with the SBA and set a briefing schedule for filing and arguing cross-motions for judgment on the administrative record that would allow for a decision by late January. See Order entered Dec. 7, 2011.

On December 15, 2011, defendant filed notice that the MCSC intended to cancel the contract award to intervenor on the following day. See Def.'s Notice filed Dec. 15, 2011. However, defendant also stated that, "[g]iven the military necessity that gave rise to the delivery order of December 1, 2011, the termination will not encompass the obligation of [intervenor] to perform that order." Id. The contract award was terminated accordingly, which left Delivery Order No. 0001 as the procurement vehicle, and on December 20, 2011, defendant filed its motion to dismiss, arguing that the complaint should be dismissed as moot

8

given that the MCSC had taken definitive action by canceling the contract, <u>see</u> Def.'s Mot. filed Dec. 20, 2011, at 1.

On December 22, 2011, plaintiff filed its motion for judgment on the administrative record, arguing, at bottom, that the MCSC should be required to cancel the entire procurement and that the MCSC's decision amounted to an improper partial award. Plaintiff responded to defendant's motion to dismiss on January 6, 2012, and on the same date, defendant and intervenor filed their responses and cross-motions for judgment on the administrative record. Plaintiff responded to defendant and intervenor's motions on January 13, 2012.

On January 20, 2012, the Friday preceding the scheduled January 25, 2012 argument, defendant filed Defendant's Notice of Additional Corrective Action. Defendant represented that the MCSC intended to take further corrective action and once again pare down its order placed on the contract by terminating for convenience revised Delivery Order No. 0001 for a number of the items. <u>See</u> Def.'s Notice of Additional Corrective Action filed Jan. 20, 2012. By this termination the MCSC would be procuring only fuel-system components at a total cost of $9,927,614.00. <u>Id.</u>

## DISCUSSION

I.  <u>Plaintiff's standing to challenge the Solicitation and mootness of plaintiff's protest</u>

The threshold question in any protest is whether or not plaintiff has standing to bring its grievance before the court. <u>See</u> <u>Myers Investigative & Sec. Servs. v. United States</u>, 275 F.3d 1366, 1369-70 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue. . . . [P]rejudice (or injury) is a necessary element of standing.") To have standing to bring a protest action, the protester must demonstrate that it is an "interested party objecting to a solicitation by a Federal Agency." 28 U.S.C. § 1491(b)(1) (2006). To satisfy this standard, the "interested party" must show that it is (1) "'an *actual or prospective bidder*[] or offeror[]'" and (2) its "'*direct economic interest* [is] affected by the award of the contract or by failure to award the contract.'" <u>Rex Serv. Corp. v. United States</u>, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (quoting <u>Am. Fed'n of Gov't Emps. v. United States</u>, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (adopting language of the Competition in Contracting Act, 31 U.S.C. § 3551(2) (2006))). An interested party is one who "can show that but for the error, it would

have had a substantial chance of securing the contract."  Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378 (Fed. Cir. 2009) (citations omitted).  5/

The facts of the present case establish that plaintiff has standing to bring this challenge.  Plaintiff has demonstrated that it meets both prongs of the Rex Service test.  First, plaintiff submitted a proposal in response to the MCSC's Solicitation, see AR 936-57; 1047-70, and the fact that plaintiff lost the award to intervenor demonstrates that its "direct economic interest" was affected by the award decision.  Further, plaintiff has demonstrated that it is an "interested party" as defined by the Federal Circuit in Labatt Food Service.  See 577 F.3d at 1378.  According to the June 12, 2011 Source Selection Decision Document, plaintiff was ranked third on non-price factors—the most important factors in the award decision—and was ranked third on price.  See AR 1344-46.  Given that the offeror that ranked second in non-price factors proposed the highest price of all seven offerors, see id., plaintiff's claim that, but for the consideration of intervenor's proposal, plaintiff had a "substantial chance" of securing the award is sufficient to establish standing.  See also id. at 1606 (noting that during debriefing, contracting officer relayed to plaintiff that it was in the competitive range "'so to speak'").

Intervenor's arguments to the contrary are not persuasive.  Advancing three reasons, intervenor contends that plaintiff lacks standing to bring this protest because it cannot make the requisite showing for interested-party status.  6/  First, intervenor argues that plaintiff has not proven that it submitted a proposal in compliance with the terms of the Solicitation.  See Intvr.'s Br. filed Jan. 7, 2012, at 14.  According to intervenor, plaintiff proposed a teaming

---

5/  Considerable confusion appears in the case law regarding the burden a party must carry to demonstrate "prejudice" sufficient to establish standing and the burden to demonstrate "prejudice" to succeed on the merits.  See generally Dyonyx, L.P. v. United States, 83 Fed. Cl. 460, 465-66 n.2 (2008) (noting that "[i]n essence, these are incongruent, although slightly overlapping, standards"); Textron, Inc. v. United States, 74 Fed. Cl. 277, 284-85 (2006) (summarizing Federal Circuit case law on the matter).  "Although the prejudice requirement for standing has been satisfied by a nominal showing that a protester could compete for the contract, the prejudice requirement required for success on the merits consistently has been more stringent."  Dyonyx, 83 Fed. Cl. at 465-66 n.2 (citations omitted) (internal quotation marks omitted).

6/  This court takes particular notice of the fact that defendant does not adopt the arguments on standing advanced by intervenor.  In fact, the only argument defendant advanced regarding standing, as discussed in detail infra, was that the merits of this protest need not be reached because the controversy has been rendered moot by the MCSC's corrective action.  See Def.'s Br. filed Jan. 6, 2012, at 18-19.

arrangement with [                    ], a company that is "not found on the SBA website, is not registered with the CCR ["Central Contractor Registration" system], and lists various suppliers that are either large businesses or are also not registered with the CCR database." Id.  Plaintiff responded by noting that the CCR listing was not required for [    ] because the CCR only applies to prime contractors dealing directly with the Government, not subcontractors.  See Pl.'s Br. filed Jan. 13, 2012, at 26 n.7.  This court concurs with plaintiff's response, especially in light of the lack of support for this position from defendant.

Second, intervenor argues that plaintiff was "incapable of performing the contract." Intvr.'s Br. filed Jan. 7, 2012, at 14.  This is a gross overstatement of the consequence of the MCSC's assigning plaintiff a [          ] rating under the Technical category.  The MCSC, or subsequently defendant in court, has never taken the position that plaintiff was incapable of performing the work it proposed.  Although the MCSC found that it would expose itself to risk should plaintiff receive the award, see AR 1299, a potential risk to the Government in contract performance is not tantamount to an offeror being incapable of performance.

Lastly, intervenor argues that plaintiff is unable to prove that, but for the alleged errors in the award of the contract, it would have received the contract award.  See Intvr.'s Br. filed Jan. 7, 2012, at 14-15.  Intervenor's reading of the standing requirements imposed on a protester is too stringent.  Plaintiff need not establish specifically that it would have received the contract but for the error alleged; rather, plaintiff must show only that it had a "substantial chance of securing the contract."  See Labatt Food Serv., 577 F.3d at 1378.  Second, as explained above, this court finds that plaintiff has made the requisite showing.  While intervenor accurately observes that another offeror had a lower price overall than plaintiff, it fails to take into consideration that the offeror that was ranked second in price was ranked fourth in non-price factors—i.e., behind plaintiff.  See AR 1344-46.  Given that the Solicitation stated that the non-price factors were more important than price, see id. at 367, this court finds that plaintiff did have a substantial chance of receiving the contract award if intervenor's proposal was disregarded.

Defendant's motion to dismiss also argues that the MCSC's corrective actions moot the pending protest, thereby placing plaintiff's claims outside the court's jurisdiction. Jurisdiction must be established before the court may proceed to the merits of a case.  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 88-89 (1998).  Courts are presumed to lack subject matter jurisdiction unless it is affirmatively indicated by the record; therefore, it is a plaintiff's responsibility to allege facts sufficient to establish the court's subject matter jurisdiction.  Renne v. Geary, 501 U.S. 312, 316 (1991); DaimlerChrysler Corp. v. United States, 442 F.3d 1313, 1318 (Fed. Cir. 2006) ("[I]t is settled that a party invoking federal court jurisdiction must, in the initial pleading, allege sufficient facts to establish the court's jurisdiction." (citations omitted)).

11

As with standing, the mootness doctrine originates from the "case or controversy" requirement of Article III of the United States Constitution. Gerdau Ameristeel Corp. v. United States, 519 F.3d 1336, 1340 (Fed. Cir. 2008) (citing Allen v. Wright, 468 U.S. 737, 750 (1984); North Carolina v. Rice, 404 U.S. 244, 246 (1971)). Federal courts are permitted to entertain only matters in which there is an ongoing justiciable issue. See NEC Corp. v. United States, 151 F.3d 1361, 1369 (Fed. Cir. 1998). As such, mootness implicates the court's subject matter jurisdiction. Id. ("If a case becomes moot it no longer presents a justiciable controversy over which a federal court may exercise jurisdiction."). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack, 395 U.S. 486, 496 (1969) (citation omitted). "Thus, to avoid dismissal for mootness, an actual controversy must remain at all stages, not merely at the time the complaint is filed." Gerdau Ameristeel, 519 F.3d at 1340.

A case will be dismissed as moot if an intervening event during its pendency "renders it impossible for [the] court to grant any effectual relief." Cyprus Amax Coal Co. v. United States, 205 F.3d 1369, 1372-73 (Fed. Cir. 2000) (holding tax refund suit not moot despite plaintiff's subsequent compliance with tax refund statute because plaintiff could potentially recover additional taxes under Tucker Act rather than under tax refund claim). As explained by the United States Supreme Court, "jurisdiction, properly acquired, may abate if the case becomes moot because (1) it can be said with assurance that 'there is no reasonable expectation . . .' that the alleged violation will recur, and, (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979) (citations omitted). "When both conditions are satisfied it may be said that the case is moot because neither party has a legally cognizable interest in the final determination of the underlying questions of fact and law." Id.

Defendant argues that, because "the agency has terminated the underlying contract award and cancelled the solicitation," the protest is now moot, Def.'s Br. filed Dec. 20, 2011, at 6, regardless of the Corps's continuing limited procurement based solely on "critical military need," id. at 10. Defendant contends that after the MCSC took corrective action, "the controversy underlying this protest is no longer live" and "[w]hether the Marine Corps erred in its evaluation process is an academic question that does not affect the [plaintiff]." Def.'s Br. filed Jan. 20, 2012, No. 81, at 1. According to defendant, "[i]t does not matter whether the Marine Corps made an irrational decision in awarding the contract to JGB Enterprises. Likewise, it does not matter whether the Marine Corps committed a clear and prejudicial violation of law in the procurement." Id. at 2.

The court finds this argument unpersuasive. Defendant essentially is contending that no contract exists because the Corps took corrective action in canceling the Solicitation,

thereby mooting plaintiff's protest. Ordinarily, defendant is correct that the termination of a sued-upon contract would moot a challenge to the award of that contract. Unfortunately for defendant, that is not the case here because work is still proceeding on the awarded contract under the auspices of "military necessity"—a contradiction that defendant did not directly address. At the same time that defendant is attempting to argue before the court that the contract no longer is in effect, it also is arguing that "there is nothing 'improper and illegal' about the critical order for fuel systems." Id. at 6. Despite assertions that the contract has been canceled, defendant rationalizes that "[t]he agency had no need to resort to a sole-source procurement when it could obtain the fuel systems through an existing contract vehicle." Id. While this court does not doubt, nor take issue with, the Corps's declarations of its needs, defendant cannot have it both ways—there is no contract existing to protest, but there is one under which to make delivery orders. Consequently, this court finds that, while the MCSC has taken corrective action, that action has not mooted plaintiff's protest because it amounts to only a partial termination of the allegedly illegal contract award. A live controversy is at issue, the resolution of which will address the injury claimed by plaintiff.

II.  Standard of review in bid protest actions

The Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (codified at 28 U.S.C. § 1491(b)) (the "ADRA"), amended the Tucker Act, 28 U.S.C. § 1491(b)(1), granting the Court of Federal Claims jurisdiction over bid protests. See Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1243 (Fed. Cir. 2010); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001) ("Domenico Garufi"). The ADRA's standard of review for agency procurement decisions adopted the standard of review set forth in the Administrative Procedure Act, 5 U.S.C. § 706 (2006) (the "APA"). See 28 U.S.C. § 1491(b)(4). The court has authority under the APA to set aside only an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also PGBA, LLC v. United States, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004) (clarifying that ADRA incorporates arbitrary and capricious standard of APA to review procurement decisions); see also Domenico Garufi, 238 F.3d at 1332-33 (making applicable the standards applied in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and its progeny to bid protests).

Accordingly, as restated by the Federal Circuit, "[a] bid protest proceeds in two steps." Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005). First, the court determines if, under the arbitrary and capricious standard, the agency acted either (1) without

rational basis, or (2) contrary to law 7/. Id.; see Banknote Corp. of Am., Inc. v United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004); Domenico Garufi, 238 F.3d at 1333; Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Aeroplate Corp. v. United States, 67 Fed. Cl. 4, 8 (2005). Second, if the court finds that the agency acted in violation of the APA standard, "then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." Bannum, 404 F.3d at 1351. In either case the plaintiff bears the "heavy burden" of proving this lack of rational basis or violation of the law by a preponderance of the evidence. Domenico Garufi, 238 F.3d at 1333.

If the agency action is determined to have violated an applicable procurement regulation, the court proceeds to address whether the action was significantly prejudicial to the protester. See Bannum, 404 F.3d at 1351, 1353; see also Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) ("When a challenge is brought on the second ground [of the Bannum test], the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." (citation omitted) (internal quotation marks omitted)). Even if a plaintiff can show that a procurement violation occurred, "[t]he prejudice determination assesses whether an adjudged violation of law warrants setting aside a contract award." Bannum, 404 F.3d at 1354. When making this evaluation, the court must be mindful that "[p]rejudice is a question of fact." Id. at 1353 (citation omitted); Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057 (Fed. Cir. 2000). "To establish prejudice, the claimant must show that there was a 'substantial chance it would have received the contract award but for that error.'" Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1331 (Fed. Cir. 2004) (quoting Statistica, Inc., 102 F.3d at 1582); see also CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir.1983) (explaining that, in order to show prejudice, plaintiff need only show "'that it was within the zone of active consideration'" (quoting Morgan Bus. Assocs. v. United States, 619 F.2d 892, 896 (Ct. Cl. 1980))); accord Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999). It is important to note that a plaintiff need not establish strict but-for causation in order to meet its burden of demonstrating that the agency's procurement violation was prejudicial. See Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996).

III. Standards of review for judgment on the administrative record and for injunctive relief

The parties filed cross-motions for judgment on the administrative record pursuant to RCFC 52.1(c). This rule provides a procedure that allows the court to expedite a trial by using a "paper record, allowing fact-finding by the trial court." Bannum, 404 F.3d at 1356.

---

7/ This language encompasses the alternative ground for a bid protest: whether the agency action constituted a clear and prejudicial violation of an applicable procurement regulation. See Domenico Garufi, 238 F.3d at 1332-33.

Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record. Id. at 1355-56.

Plaintiff seeks a permanent injunction enjoining the MCSC from continuing to procure under its emergency order—revised Delivery Order No. 0001. The Federal Circuit has described injunctive relief as "extraordinary relief." FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993); see CACI, 719 F.2d at 1581. Adoption of the APA substantive standard of review did not change the court's standard for granting injunctive relief. See PGBA, 389 F.3d at 1225-26 (clarifying that ADRA incorporates arbitrary and capricious standard of APA to review procurement decisions, but did not change court's discretion in granting remedy of injunctive relief). In order to obtain an injunction, the Federal Circuit requires a protester to establish that "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009). Success on the merits previously has been held to be the most important factor for a court to consider when deciding whether to issue injunctive relief. See Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007).

IV.  Material misrepresentation

Plaintiff's primary challenge to the award of the contract is that intervenor made a material misrepresentation in its proposal by listing [      ] as a supplier to be used in the completion of the procurement. In order to establish a material misrepresentation, "plaintiff must demonstrate that (1) [the awardee] made a false statement; and (2) the [agency] relied on that false statement in selecting [the awardee]'s proposal for the contract award." Blue & Gold Fleet, LP v. United States, 70 Fed. Cl. 487, 495 (2006) (citation omitted), aff'd, 492 F.3d 1308 (Fed. Cir. 2007); see also Sealift, Inc v. United States, 82 Fed. Cl. 527, 538 (2008). 8/ According to the Federal Circuit,

> the submission of a misstatement . . . which materially influences consideration of a proposal should disqualify the proposal. The integrity of the system demands no less. Any further consideration of the proposal in these

_____

8/ This court is aware of the decision in Northrop Grumman Corp. v. United States, 50 Fed. Cl. 443 (2001), in which the Court of Federal Claims stated that a misstatement in a proposal "is not something to be punished unless the errors were willful and egregious." That opinion would require some proof that the awardee's actions were "sinister, not just deficient or overestimated," id. at 469. This grafting of additional requirements onto the standard for a material misrepresentation is not supported by binding precedent, and this court declines to impose this heightened burden.

circumstances would provoke suspicion and mistrust and reduce confidence in the competitive procurement system.

Planning Research Corp. v. United States, 971 F.2d 736, 741 (Fed. Cir. 1992) (citation omitted) (internal quotation marks omitted) (illustrating misrepresentation tactic known as "bait and switch" in which offeror submits proposal with the intent to substitute some aspect that it had used to win award). Thus, if plaintiff can establish that (1) intervenor falsely indicated that [      ] was a subcontractor that intervenor intended to use in the work performed under the Solicitation and (2) the MCSC relied upon this representation in awarding the Contract, then plaintiff has met its burden of proving a material misrepresentation.

As an initial matter, this court rejects defendant's attempts to vary the misrepresentation analysis depending on where on a procurement time line one examines the statements at issue. See Def.'s Br. filed Jan. 6, 2012, at 20-29. Analyzing misrepresentations that may have occurred at other stages of this protracted legal battle is unnecessary because the controlling issue is whether or not intervenor made a material misrepresentation in its proposal to the MCSC. 9/ The MCSC was entitled to rely on intervenor's representations in its response to the Solicitation, and it is irrelevant that intervenor's proposal was facially acceptable. See id. at 22. Defendant has mistaken the nature of the required analysis. It is axiomatic that material misrepresentation claims arise from proposals that appear facially valid because an agency would not make an award based on a patently obvious misrepresentation. Instead, it is the nature of a misrepresentation to appear valid on its face because that validity—indeed appeal—is what leads to reliance by the agency. Thus, courts do not examine the subjective mindset of the agency, but instead look only to whether or not the statement itself constitutes misrepresentation—something that is determinable the moment that it is submitted for agency consideration—and then whether or not the agency relied on that statement in making its award decision. As long as the representation has in fact been made, then it is appropriate to apply the misrepresentation standard, regardless of when the information casting doubt on the statement came to light.

---

9/ In the same vein, two reasons counsel against addressing plaintiff's contention that the SBA review is part of the award process and thereby binding on the agency. First, the material misrepresentation is dispositive in this bid protest. Second, the court's focus of review is what was represented to the MCSC in intervenor's proposal; the fact that evidence of a misrepresentation came to light in communications with the SBA specifically is irrelevant. What is relevant is the light that the statements made to the SBA shed on the statements made to the MCSC, not to whom those statements were made. Because of the foregoing, this court finds it unnecessary to opine on the exact role that a referral to the SBA plays in an ongoing protest.

The material misrepresentation claim in this case stems from the information requested from the potential offerors in the Solicitation and the manner in which intervenor structured its proposal. The Solicitation instructed offerors, regarding past performance, to provide particular information on at least "2 programs underway or completed during the past 3 years by your subcontractors similar in content and scope to that proposed." AR 365. Among the information to be provided about the offeror's subcontractors was a "[d]escription of relevance to proposed work." Id. The MCSC informed potential offerors that past performance was the most important factor to be evaluated and that the Government would "evaluate how well the Offeror performed on previous <u>relevant</u> efforts of similar type." Id. at 367.

In response to this particular requirement in the Solicitation, intervenor devoted an entire section to past performance in its proposal. See id. at 1154-60. According to intervenor's proposal, "Tables 3 through 5 contain past performance data for JGB suppliers." Id. at 1154. Table 3 was titled [                                    ]. Id. at 1157. Under the first, "Relevance to Proposed Work," intervenor stated, [

] and, under the second, [

]. Id. at 1157-58. Table 4 was listed immediately beneath Table 3 and was titled [                        ]. Id. at 1158. Under the first "Relevance" entry, intervenor stated, [

]. Id. The second "Relevance" entry stated [

]. Id.

This court also has examined the technical aspects of intervenor's proposal in order to appreciate fully the context in which the MCSC considered and evaluated the proposal. Under "Teaming Arrangements," intervenor stated that "JGB is the source for approximately [   ] of the part numbers required . . . . The remaining are produced by a variety of [OEMs] with whom JGB has had long and successful relationships." Id. at 1161. As noted above, intervenor previously had communicated to the MCSC that its "key tactical fuel and water components OEMs include . . . [          ]." Id. at 145. Intervenor then details a teaming arrangement with [          ]. Id. at 1162. Following, under the section "Prime and Subcontractors' Roles," intervenor explained that "[s]pecific hardware suppliers will perform as subcontractors to JGB. Their role is to deliver fully compliant hardware, on time, to JGB in response to orders." Id.

The first issue is whether or not intervenor represented that [      ] was being proposed as a supplier—thereby meaning, based on the language and presentation of intervenor's proposal, that [      ] would be a subcontractor on this effort.  Interestingly, a consensus among the parties has emerged that these representations in intervenor's proposal do indicate that [     ] was being offered as a supplier of [   ] component parts.  Defendant's analysis of the proposal led it to state that "[t]he only reasonable conclusion is that [      ] was a supplier, but that JGB Enterprises would not use [      ] to supply end items in a way that violates the small-business requirements."  Def.'s Br. filed Jan. 6, 2012, at 23.  Intervenor also stated that "a review of the proposal will reveal that . . . JGB did mention [      ] as a supplier."  Intvr.'s Br. filed Jan. 7, 2012, at 19.  This court agrees with those assessments.

Given that this court has found that intervenor did represent to the MCSC that it was proposing [     ] as a supplier, the next issue is whether or not this representation was false or misinformation.   The evidence presented—most notably in the form of the communications that intervenor had with the SBA—indicates that intervenor proposed [    ] as a means to secure a high past performance rating.  In response to inquiries from the SBA, intervenor stated, as follows:

> The intended purpose for including the past performance of [      ] in our proposal was to provide other relevant information as required by the proposal instructions.  In particular the [                  ] . . . is an item that past procurement history rests exclusively with [      ] . . . .  You will notice that every purchase of this item by the military since 2005 has been awarded to [     ].  Our intention as previously stated in this letter was to either manufacture this item ourselves or thru [*sic*] another viable small business manufacturer. [     ] was simply listed as they are the only previous supplier of the [      ] that we listed in our proposal.  We would only use [      ] as a technical reference point if questions arose during our assembly of the item.

AR 2127.  In light of all the evidence, this explanation is equivocal.

Intervenor's position is that it provided this information to the MCSC because, in all other instances, the military procured this part through [      ].  In other words, intervenor wanted to list [     ] in the past performance section of its proposal not because it had a supply arrangement in place for this particular contract, but simply because the MCSC was familiar with [     ].  This begs the obvious question: why list a fact that (1) the MCSC already knows, and (2) is completely irrelevant to the manner in which intervenor intended to satisfy the demands of this procurement.  The equally obvious answer is that intervenor was seeking to bolster its past performance evaluation, given that this was the most important factor to the award under the Solicitation.

When pressed about [        ] involvement with this procurement, intervenor stated that [      ] would only "supply" it with technical services to help intervenor manufacture the part itself. 10/ This explanation of the duties to be preformed by [      ] is not supported by the record that was available when the representations were made to the MCSC.  Absolutely no evidence in the technical section of intervenor's proposal indicates that one of the duties of intervenor's subcontractors was to act as a "technical reference point."  See AR 1160-67.  Moreover, the SBA found that "[t]here are no other indicia of potential affiliation between JGB and [            ] such as joint venture agreements, financial agreements or other contractual agreements."  Id. at 1985.  It is inconceivable that [      ] would be providing technical information to a separate business without a contract in place that provides it with remuneration for its services, thereby leading this court to wonder whether [        ] is even aware of the role that intervenor has assigned to it.  Based on the evidence presented, this court finds that the listing of [      ] as a supplier in the proposal was a misrepresentation of the role that [      ] was to play should intervenor win the award, given that intervenor explicitly stated to the SBA that it was never intervenor's intention to use [        ] as a supplier of the parts for which it listed past performance.

The final issue is whether or not the MCSC relied on the misrepresentation when making the award decision.  Again, the answer must be in the affirmative based upon the TET's narrative evaluation of intervenor.  See id. at 1297-98.  In the past performance evaluation section, the TET gave intervenor a [      ] rating based on [

      ]. Id. at 1297.  Although this statement by itself is vague, the narrative relating to the technical factor provides the necessary context.  In giving intervenor an [        ] technical rating, the TET stated, "[t]eaming arrangements with: [

      ].  Proposed work by prime and subcontractors adequately addressed."  Id. at 1298.  It is not at all apparent why the MCSC inferred a teaming arrangement between [      ] and intervenor.  However, what that explanation does show is that MCSC placed great emphasis on the fact that [      ] involvement was delineated in intervenor's proposal, and, consequently, the TET awarded intervenor high marks for the two most important evaluation factors.  Defendant even concedes that "the Marine Corps based its evaluation in part upon its belief that [      ] was a supplier in some capacity."  Def.'s Br. filed Jan. 6, 2012, at 25.  In addition, this court notes that the MCSC was justified in thinking that the listing of [      ] past performance information indicated that it was being proposed as a subcontractor, given that the instructions in the Solicitation required potential offerors to list past performance information for "your subcontractors."  AR 365.  The MCSC can be excused for not assuming that [        ] was being listed simply because it had previously

---

10/  Intervenor represented during oral argument that, in fact, [      ] was the only entity that manufactured this component part.

supplied the Marine Corps with those component parts on separate, unrelated occasions. In fact, this is the only rational way to interpret intervenor's listing [    ] past performance.

Therefore, this court finds that plaintiff has met its burden by showing that intervenor made a material misrepresentation in listing [    ] past performance; that intervenor represented to the MCSC that [    ] was being proposed as a supplier and a subcontractor for this procurement; and that this constitutes a clear violation of an applicable procurement regulation, FAR 52.212-2. Having found a violation of a procurement regulation, this court next conducts "the prejudice determination [to] assess[] whether an adjudged violation of law warrants setting aside a contract award." Bannum, 404 F.3d at 1354. As stated above, "[t]o establish prejudice, the claimant must show that there was a 'substantial chance it would have received the contract award but for that error.'" Galen Med. Assocs., 369 F.3d at 1331 (quoting Statistica, Inc., 102 F.3d at 1582); see also Alfa Laval Separation, 175 F.3d at 1367 (noting that, in order to show prejudice, plaintiff need only show that it was within zone of active consideration).

Based on the facts presented in this case, the court does find the procurement violation to have been prejudicial to plaintiff. The MCSC's evaluation showed that the agency relied on the misrepresentation in evaluating intervenor's past performance. See AR 1297-98. Because of this misrepresentation, intervenor received a favorable rating for past performance—the most important criterion for selecting the awardee of the contract. Had intervenor not been assigned such a [    ] past performance rating—or been considered at all given its material misrepresentation—then plaintiff would have had a substantial chance of winning the contract award. Plaintiff was ranked third with respect to price and non-price factors. Id. at 1344-46. The offeror that was ranked ahead of plaintiff in non-price factors ranked last in price, and the offeror ranked second in price was ranked behind plaintiff in the more important non-price factors. See id. Furthermore, plaintiff has argued that, during debriefing, the MCSC contracting officer explicitly conveyed to plaintiff that it was "in the competitive range 'so to speak,'" id. at 1606, a statement that defendant has never disputed. Given the competitive position that plaintiff was in, the award of the contract to intervenor based on a misrepresentation did prejudice plaintiff sufficiently for plaintiff to succeed on the merits of its challenge. 11/

────────────────

11/ Because the court finds the material misrepresentation claim dispositive on the merits, the court does not reach plaintiff's argument on the SBA's size determination and the effect of 13 C.F.R. 121.1009(g)(2) (2011). Moreover, it would be imprudent for the court to decide that issue on the briefing currently before the court. The parties' briefs do not adequately address the issue that prompted the change in the regulation's language nor how the revised language applies to a mixed finding of eligibility from the SBA, as opposed to a unitary size determination. Lacking precedent and further guidance, an attempted resolution of the new issues presented by this regulation likely would hinder later decisions on its applicability without aiding the resolution of the case at bar.

V.  Whether the MCSC utilized the methodology established by the Solicitation
    to evaluate offerors' prices

Plaintiff has also advanced an additional argument on the merits regarding the evaluation of price data performed by the MCSC.  Plaintiff charges that the MCSC failed to follow the methodology for evaluating all of the offerors' price proposals as established by the Solicitation and as addressed by the agency in the pre-bid questions and answers.  See Pl.'s Br. filed Dec. 22, 2011, at 31.  Included with the Solicitation was a workbook with several spreadsheets that the MCSC asked each offeror to fill in with its pricing data.  See AR 366.  In completing these spreadsheets, an offeror was to enter a price for every single item that potentially could be ordered under the contract.  See id.  This methodology required offerors to quote the unit price of each item should the MCSC order between 1-10 units of that item, 11-50 units, 51-100 units, and greater than 100 units, and to provide such price quotations for the five fiscal years covered by the contract.  See id.  The Solicitation, in relevant part, provided that "[p]rice information presented by the offeror will be evaluated for reasonableness.  The Government will calculate an evaluated price for each Offeror's proposal by adding together all contract line item numbers (CLINs) against an evaluated quantity."  Id. at 367.

Plaintiff argues that the MCSC did not follow this framework in evaluating the proposals.  According to plaintiff, the MCSC failed to select and apply an evaluated quantity and thus make a reasonableness determination "'against an evaluated quantity.'"  See Pl.'s Br. filed Dec. 22, 2011, at 32 (quoting AR 367).  Instead, plaintiff argues that the MCSC "simply totaled all the proposed prices quoted for a particular CLIN, including each of the different alternative, quantity-based prices for that CLIN . . . without regard to the quantities that those prices applied to . . . ."  Id. (emphasis omitted).  "[A]lthough the RFP ["Request for Proposal"] required offerors to insert in their proposals the proposed prices for various quantities of ordered items . . . the price evaluation was not based on a comparison of an offeror's proposed prices for any particular quantity."  Id.  Plaintiff concludes that this method of evaluating prices was arbitrary and the departure from the Solicitation's framework was unreasonable.

Defendant first counters that this challenge to the Solicitation's pricing scheme has been waived "because that scheme was set forth in the solicitation and the Marine Corps did not deviate from it."  Def.'s Br. filed Jan. 6, 2012, at 31.  Thus defendant argues that plaintiff's challenge under the Federal Circuit's decision in Blue & Gold, 492 F.3d at 1312, is actually to the methodology employed by the MCSC and therefore is untimely.  The Federal Circuit ruled in Blue & Gold that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a

bid protest action . . . ." Id. at 1313.  According to the Federal Circuit, "[v]endors cannot sit
on their rights to challenge what they believe is an unfair solicitation, roll the dice and see
if they receive [the] award and then, if unsuccessful, claim the solicitation was infirm." Id.
at 1314 (citation omitted).

This court agrees that the automatic summation of the columns in the spreadsheets
provided did convey information to the offerors as to the types of information that the MCSC
would be considering.  It is also a fact that the offerors noticed the apparent discrepancy
between what they were being asked to provide—pricing information for each item over
different quantity bands for each fiscal year—and the automatic summation of all of the
CLIN columns across all of the fiscal years.  This created confusion.  It appears that
prospective offerors directed at least three questions to the MCSC in the question-and-answer
period relating to both the summation of the pricing data and the role of an evaluated quantity
in the evaluation scheme.  See AR 759-60, 769, 774-75.  In question 31 an offeror stated,
"In reference to attachment 5, the calculations in each row of Column Z of CLINs 0001 thru
[sic] 0004 does [sic] not match the heading.  Please Clarify." Id. at 759-60.  The agency
responded that "[e]ach row of column Z should be calculated as the heading indicates.
Delete '/20' from the calculation in each row of column z . . . ." Id.  Column Z's heading
reads "Summation of Columns 'E' thru [sic] 'X,'" with column E being the first column with
pricing data for each item in it and column X being the last.  See e.g., id. at 586.  As a result
of this response, question 77 queried, as follows:

> Per Attachment 4, Evaluation, Price, the offeror is informed that the
> government will calculate an evaluated price for each proposal by adding
> together each CLIN against an evaluated quantity.  The offeror is further
> informed that the evaluated price formula will be based on the total prices in
> FY11-FY15 (columns E through X) for each CLIN (as calculated in column
> Z).  Separately, in response to a question, the government has stated that the
> Attachment 2 quantities are notional only and that the formula in Column Z
> should delete the "/20" portion of the formula.  This seems to imply that the
> evaluated quantity will be 20 units for each and every item.  Please confirm
> that this is the case, and if not, what is the evaluated quantity that the
> government intends to use for each item in each CLIN?

Id. at 769.  The MCSC responded, as follows:

> Yes.  The Procurement Plan in Attachment 2 is notional only. . . . As the
> instructions of Attachment 5 indicate: Populate columns "E" thru [sic] "Y" of
> the tab[s] . . . . Price information presented by the offeror will be evaluated for
> reasonableness.  The Government will calculate an evaluated price for each
> Offeror's proposal by adding together all contract line item numbers (CLINs)

> against an evaluated quantity.  The total evaluated price equates to the pricing
> of the CLINs presented herein.

Id.  Aside from illustrating the dangers of inviting an answer to a compound question, the
MCSC's answer indicates that an evaluated quantity will be used and that the MCSC will
apply that number in evaluating each offeror's proposal.

Because this issue was important, and the agency was less than clear as to the exact
method that the MCSC would be using to evaluate offerors' price proposals, an offeror tried
one final time in question 100 to elicit a meaningful response from the MCSC.  Question 100
reads, as follows:

> The government has stated in several places that "the evaluated price formula
> is based on the total prices in FY11 to FY15 (adding columns E through X)"
> and that it will be based on "adding together all CLINS against an evaluated
> quantity[.]"  These answers along with the structure of the spreadsheet seem
> to imply that the evaluated quantity is 1 each for every system and component
> . . . .  What is the evaluated quantity that the government will use to determine
> total evaluated price?

Id. at 774-75.  In response the MCSC merely parroted back the instruction in the Solicitation
that offerors were to fill in the pricing information and that "[t]he Government will calculate
an evaluated price for each Offeror's proposal by adding together all . . . CLINs . . . against
an evaluated quantity."  Id. at 774.

Based on these responses, this court is not convinced that "[t]he process was
transparent" nor that the term "evaluated quantity" was patently ambiguous.  See Def.'s Br.
filed Jan. 20, 2012, No. 82, at 12.  Instead, the most natural reading of the Solicitation's
instruction and the MCSC's answers is that the agency was unwilling to impart the exact
quantity that would be used as the "evaluated quantity," but that some quantity would be used
in rating the offerors' proposals.  Given the plausible explanation for the MCSC's opaque
answers, it is likely that, had plaintiff filed a pre-award bid protest, the Government would
have been able successfully to defend against it because the use of an evaluated quantity
would be viewed as a reasonable means of evaluating the offerors' proposals.

Defendant mistakenly analogizes the present challenge to the one presented in Blue
& Gold.  Although plaintiff has stated that "[t]his method does not establish whether one
offeror's proposal would be more or less costly than another's," Pl.'s Br. filed Dec. 22, 2011,
at 32, plaintiff is not challenging the methodology used by the MCSC.  Instead, plaintiff
adequately has established that it is challenging only the failure of the MCSC to follow the
framework set forth in the Solicitation.  See Pl.'s Br. filed Jan. 13, 2012, at 19-23.  This court

agrees that plaintiff "is not suggesting that some other evaluation method should have been performed or that the stated approach to use an evaluated quantity was in itself not proper." Id. at 21.  Therefore, plaintiff has not waived its pricing challenge.

Having found that plaintiff has not waived its challenge to the pricing evaluation issue, this court now must determine if the agency's action was reasonable.  The court's role in a bid protest, including ascertaining the existence of a rational basis, is not to substitute its judgment for that of the agency; indeed, the agency generally is accorded wide discretion in evaluating bids.  See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (stating a court should not "substitute its judgment for that of the agency"); CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008); Grumman Data Sys. Corp. v. Widnall, 15 F.3d 1044, 1046 (Fed. Cir. 1994); see also Camp v. Pitts, 411 U.S. 138, 142-43 (1973) (holding that courts should review agency record to determine if agency's decision is supported by rational basis).  An agency's decision will be upheld even if the court might have applied the procurement regulations in a different fashion had the court been in the agency's position.  See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (citing M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)); Lumetra v. United States, 84 Fed. Cl. 542, 549 (2008) ("[T]he court 'will not second guess the minutiae of the procurement process in such matters as technical ratings and the timing of various steps in the procurement.'" (quoting E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996))).  Instead, under the "'highly deferential' rational basis review," Savantage Fin. Servs., Inc. v. United States, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (quoting CHE Consulting, 552 F.3d at 1354), the court "must sustain an agency action unless the action does not 'evince[] rational reasoning and consideration of relevant factors,'" id. (alteration in original) (quoting Advanced Data Concepts, 216 F.3d at 1058).

Defendant attempts to bolster its position that "the Marine Corps did not deviate" from the Solicitation's framework.  See Def.'s Br. filed Jan. 6, 2012, at 31-33.  Most notably, defendant contends that the MCSC did use an evaluated quantity, and that evaluated quantity was twenty units. 12/  Id. at 33.  According to defendant, "the spreadsheet automatically

---

12/  Defendant also illustrates how the entire price evaluation process was conducted, and how, when considering the methodology of the evaluation in toto—i.e., including the weighting step for the different CLINS—the MCSC's evaluation scheme produced a reasonable result given the nature of the contract.  See Def.'s Br. filed Jan. 6, 2012, at 33-35. This court is interested only in plaintiff's challenge that the MCSC failed to utilize an evaluated quantity—a question that requires a finding as to whether the MCSC followed a methodology explicitly set forth in the Solicitation.  Whether or not the overall effect of the MCSC's denominated price evaluation produced a reasonable result is beyond the purview of this challenge and would have been more appropriately considered in a Blue & Gold-type challenge.  Therefore, the court does not address the other steps that the MCSC used in

summed the prices of one unit for each fiscal year at each quantity range, resulting in a price for an 'evaluated quantity' of 20 units." Id. at 32.  Defendant reasons that, because "each cell [in the spreadsheet] contained a price for . . . one unit," the summation of the twenty in-line cells across the four quantity bands for the five fiscal years for each item did amount to an evaluated quantity of twenty units.  Def.'s Br. filed Jan. 20, 2012, No. 82, at 11.  The MCSC used the results returned by the spreadsheet in evaluating the proposals for price, so it followed the framework established by the Solicitation.

Defendant's contortions to align the evaluation performed by the MCSC with the language of the Solicitation stretch the plain meaning of "evaluated quantity" too far to allow this court to concur with its position.  Plaintiff has articulated a far more persuasive position on the meaning of evaluated quantity, see Pl.'s Br. filed Jan. 13, 2012, at 21-22, and it is clear from the administrative record that, not only was twenty not the evaluated quantity used by the Corps, but also that the MCSC did not use any evaluated quantity to evaluate the offerors' proposals.

The term "evaluated quantity" must refer to a specific number of items that the MCSC hypothetically would purchase.  It is undeniable that each cell contained a price-per-unit quote for an item should the MCSC place an order within that particular quantity band.  However, the proposition that each cell then represented one "unit" is misguided.  It is possible to order only a single unit from the first quantity band—the 1-10 unit band.  In order to obtain the price quoted in the other quantity bands, the MCSC must assume that it is purchasing the requisite number of items that correspond to that particular quantity band.  For example, if the MCSC actually used twenty units as the evaluated quantity, then the MCSC could have considered only the price quotes in the 11-50 quantity band in evaluating the proposals.  The MCSC did not do this.

The Solicitation further implies that the evaluated quantity would be applied over the entire duration of the contract.  In that case if twenty was the evaluated quantity, then the MCSC would only be purchasing four units per fiscal year, and the correct quantity band to evaluate each offeror's proposal would be the 1-10 band.  Defendant has not even attempted to argue that the agency performed this calculation.  Moreover, it is not possible for the MCSC to order a single unit from each quantity band because the prices established for each band assume that the MCSC is ordering a quantity of items within only that band; stated another way, the Government cannot purchase twenty units and pay a different price for each

_____

12/  (Cont'd from page 24.)

evaluating the proposals or gauge the reasonableness of what the agency intended to evaluate.

unit. Therefore, not only did the MCSC not use an evaluated quantity of twenty units, neither did it use an evaluated quantity of one unit.

This court concurs with defendant's arguments as to why simply picking one number of items as a sample order to evaluate cost is probably insufficient to fully assess the costs to the MCSC of a wide range of potential orders when the exact number of items to be ordered under a contract is unknown.  See Def.'s Br. filed Jan. 20, 2012, No. 82, at 12. According to defendant, "[u]nder the actual pricing evaluation, the Marine Corps calculated a price that reflected all quantity ranges to ensure that, regardless of how many items the Marine Corps ordered, it would receive the best overall price."  Id.  This suggests to the court that what the MCSC actually was seeking was an average price per unit that encompassed all quantity bands; essentially, the MCSC sought an average price that it would be charged regardless of the quantity ordered.  While this seems like a reasonable approach, the court strongly doubts that the method envisioned by the MCSC would have accomplished this objective sufficiently because the different quantity bands required the agency to use a weighted average—rather than a straight average—to accurately assess the prices proposed by the offerors.  13/  Regardless, plaintiff is not pressing a challenge to the pricing

---

13/  The reason that a weighted average is necessary is that the quantity bands alter the effects of different prices at different quantity levels.  Consider the following chart:

| | FY2011 price data for one item (in dollars) | | | | | |
|---|---|---|---|---|---|---|
| | Quantity 1-10 | Quantity 11-50 | Quantity 51-100 | Quantity 101+ | Total Price | Average Price per Unit |
| Offeror A | 10 | 10 | 10 | 10 | 40 | 10 |
| Offeror B | 20 | 15 | 10 | 5 | 50 | 12.5 |

According to the methodology endorsed by defendant, it would appear that Offeror A is proposing the best price to the Government.  However, this does not accurately take into account the different quantities that need be purchased to obtain those prices.  For example, were the Government to order five items, Offeror A would charge $50.00 and Offeror B would charge $100.00.  The overall cost to the Government is higher with Offeror B. However, should the Government order 105 items, Offeror A charges $10,500.00 whereas Offeror B charges only $525.00.  Should the Government truly have no specific quantity in mind, it would appear that Offeror B actually might be the more attractive choice simply because of the savings offered to the Government for higher-quantity purchases due to economies of scale.  While the Government pays $50.00 more on a purchase of five items from Offeror B, it saves $525.00 on the larger order.  While Offeror A might be less expensive in lower quantity ranges, the exact same percentage difference at the higher

methodology, and the court only considers whether or not the MCSC performed its stated tasks.

The MCSC ultimately is bound by the language of the Solicitation, which clearly stated that it would compare offerors' prices "against an evaluated quantity."  See AR 367. It might have been most reasonable for the MCSC to select an evaluated quantity from each of the different quantity bands to evaluate the effects of the economies of scale that each offeror potentially could offer.  However, that is not what was stated in the Solicitation. What was stated was that the MCSC would use an evaluated quantity against which it would compare the offerors' prices.  This it did not do. 14/  Therefore, the court finds that the MCSC acted irrationally and unreasonably by failing to follow the evaluation procedure established by the Solicitation.

Further, the court finds that this unreasonable departure prejudiced to plaintiff.  As illustrated by the chart in footnote 12, the evaluation actually used by the MCSC can lead to skewed (and strategic) pricing by offerors that does not accurately reflect their costs per item. Referring to the chart, it can be assumed that Offeror A proposed its prices envisioning the simple summation used by the agency, whereas Offeror B—a representation of plaintiff in this hypothetical—followed the Solicitation's instructions and made accurate predictions as to prices at particular quantity ranges.  According to the evaluation performed, Offeror A receives a higher rating.  However, Offeror A very well could have received a lower rating had the agency performed as it said it would and compared the proposals against an evaluated quantity.  Thus, the resulting harm to an offeror whose proposal was not fairly considered due to the departure from the Solicitation's framework constitutes sufficient prejudice for this court to find that plaintiff has succeeded on its merits challenge to the MCSC's price evaluation of the proposals.

---

13/  (Cont'd from page 26.)

quantity ranges is magnified because of the number of items that are ordered at that price. This example further illustrates why it is important to consider the quantity bands when examining the unit prices: the differences in the quantities ordered at each range magnify differences in an offeror's proposed prices.

14/  Defendant states that its announced weighting of 20 percent for component CLINs 2 and 4 and 80 percent for system CLINS 1 and 3 allowed for the weighting of evaluated prices.  See Def.'s Br. filed Jan. 6, 2012, at 32.  However, the court understood that the respective percentages weighted the likelihood that the more expensive systems would be ordered.

VI. <u>Other factors warranting injunctive relief</u>

Intervenor's continued performance on the illegally awarded contract will cause plaintiff irreparable harm in the form of economic loss and monetary damages for lost profits. Recovery of bid and proposal costs would do little, if anything, to compensate for the loss.

In balancing the relative harms, the court recognizes that the MCSC knew about the issues resulting from intervenor's representations regarding [     ] before it permitted performance of Delivery Order 0001 to resume after December 1, 2011. Accordingly, defendant and intervenor readily assumed the risk of harm that they could sustain if a permanent injunction were granted—a risk that this court explicitly warned about during the status conference held on December 7, 2011. <u>See</u> Tr. at 30-35. The question discussed with the parties was whether plaintiff should move for interim injunctive relief now that the MCSC intended to proceed with its reduced procurement needs ($30 million versus $47 million), or whether the court should proceed with the parties' schedule whereby plaintiff's right to an injunction would be resolved by late January 2012. Defendant preferred the latter, although plaintiff was prepared to amend its complaint and move forward. The court advised that national security concerns in the then-$30 million order likely would prevail during the six-week window. The court continued that, were plaintiff ultimately to prevail on the merits, the Government could not argue that the additional time for final resolution aggravated the prejudice caused by an additional delay.

Given this advance warning, the magnitude of the harm to the Government is reduced. However, the court will address defendant's argument that there would be no harm to GTA if the court were to withhold an injunction, given the corrective action taken by the MCSC. According to defendant, given that the MCSC already has addressed plaintiff's complaints by delimiting the original award to only a tenth of the original contract amount and has structured what remains around those harms most bothersome to plaintiff, there can be no harm to plaintiff in allowing the small portion of the remaining contract to be performed uninhibited.

Although this argument has pragmatic merit, the court finds that ultimately there would be more harm to plaintiff than to the Government if performance of the twice revised Delivery Order 0001, which was issued under the subject contract, were allowed to continue. The obvious harm that plaintiff suffers should an injunction not issue is the loss of business by not having the opportunity to fill the MCSC's order. Essentially, plaintiff loses out on the opportunity to perform for the $9.9 million. Defendant has argued that the corrective action taken by the MCSC has removed whatever harm a tainted proposal may have caused. As argued by defendant, revised Delivery Order 0001 "does not implicate the evaluation process" because the decision to make the covered limited purchases was based solely on the Marine Corps's "critical military need." Def.'s Br. filed Jan. 20, 2012, No. 81, at 3.

Defendant argues that "[a]ny alleged injury to [plaintiff] is one-step removed from the award decision, and thus not traceable to it, because the agency did not rely upon the award decision to cause the alleged harm." Id. at 4. Thus, defendant concludes that the "corrective action places [plaintiff] in the same position as all other offerors." Def.'s Br. filed Dec. 20, 2011, at 8.

This is not an accurate summation of plaintiff's position. At bottom, the harm to plaintiff stems from the MCSC's failure to consider intervenor's misrepresentation and noncompliance with a statutory requirement. Although the MCSC has taken corrective action to eliminate reliance on those specific parts of intervenor's proposal on which the MCSC relied, this surgical correction does not place plaintiff in the same position as other offerors. Instead, the MCSC is still relying on intervenor's misrepresentation because intervenor was the contractor awarded revised Delivery Order 0001—a position that it obtained as a result of its misrepresentation. Put another way, the MCSC rated intervenor as most qualified based on a proposal containing a material misrepresentation, and, although the MCSC might be viewed as having nominally canceled that contract award, when looking for a contractor to fulfill its "critical military need," the MCSC simply selected the offeror it had just ranked most qualified on that canceled Solicitation to fill the Delivery Order. Thus, intervenor is still benefitting from its material misrepresentation in a way that is prejudicial to plaintiff which has a right to assume that the procurement process will be followed. The harm to plaintiff is that one of its competitors currently is benefitting from its misuse of the procurement system; plaintiff has a right to lawful adherence to the procurement system and is harmed by a denial of a fair opportunity to compete. In this particular case, this magnitude of harm should an injunction not issue outweighs the harm to the Government—a slightly prolonged procurement timeline and the administrative costs of correctly adhering to procurement law—that would result from the issuance of an injunction.

Finally, the court must consider the effect—if any—of an injunction on the public interest. National defense and national security concerns will be considered in tandem with concerns for the public interest and the integrity of the procurement system. In this regard the court takes into account applicable procurement regulations, including SBA regulations. Notably, the SBA's size determination appears to require termination of intervenor's current contract. The public interest favors requiring the Government to follow its procurement regulations. See Sys. Application & Techs., Inc. v. United States, 100 Fed. Cl. 687, 721-22 (2011). Given the SBA's determination and the fact that the MCSC has continued its contract with intervenor, it is apparent that an injunction halting performance actually would promote the public interest.

VII.  "Due regard to the interests of national security"

The final issue governing injunctive relief—determining that the grant of an injunction serves the public interest—implicates 28 U.S.C. § 1491(b)(3), which provides that, in exercising its bid-protest jurisdiction, "the court[] shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action."  See also Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 702 (2010) ("[W]hen military and national security interests are implicated, the public interest factor gains 'inflated' importance in the court's balancing of the equities." (citation omitted)). Nonetheless, when the Government makes a claim of national security, as it has done in this protest, a "'[c]ourt will not blindly accede to such claim[].'"  Gentex Corp. v. United States, 58 Fed. Cl. 634, 655 (2003) (quoting Harris Corp. v. United States, 628 F. Supp. 813, 822 n.13 (D.D.C. 1986)).  It must, however, give the claim "the most careful consideration," id., while evaluating it "with the same analytical rigor as other allegations of potential harm to parties or the public."  Id. (citation omitted).

Defendant's interpretation of § 1491(b)(3)'s admonition, as elaborated upon during argument, is that the MCSC has tailored its procurement needs in Defendant's Notice of Additional Corrective Action to take account of critical and minimal military needs.  The problem with this approach is that the Government is seeking to equate "due regard" to abstention from consideration.  In other words, defendant reasons that, because the MCSC has taken ongoing corrective action to delimit this procurement to its absolute minimum in terms of exigent need, the "corrected" scope of procurement should proceed.  Defendant explained in its most recent brief:

> The Marine Corps should have included those items in its termination action of December 15, 2011, because it intended for the termination to encompass all of the awarded contract that did not depend upon a military need for which there is not an alternative contract vehicle.  With this additional termination action, the order for critical items includes only the fuel systems: the Tactical Airfield Fuel Dispensing System, the Amphibious Assault Fuel System, and the Expeditionary Refueling System.  Those systems cost approximately $9,927,614.00.  *This should have been the order from the start.*

Def.'s Br. filed Jan. 20, 2012, No. 82, at 16 (emphasis added).  And, defendant might add, plaintiff has been wasting its time ever since the start, given this outcome.  Defendant candidly expressed during argument that, without admitting error, the MCSC "has tailored an injunction on itself."

This position is one step away from the argument that the Government advocated recently in Ceradyne, Inc. v. United States, No. 11-725C, 2011 WL 7069611 (Fed. Cl. Dec.

22, 2011).  According to Judge Firestone, the Government argued that "the court has discretion to voluntarily refrain from exercising jurisdiction over this matter, regardless of any other facts at issue in the merits." Id. at *12 n.8.  The protester in Ceradyne countered, according to the judge, that "such concerns are only properly raised in the context of evaluating whether or not to grant injunctive relief to a successful claimant." Id.  Judge Firestone did not reach the issue, but this court must and holds that the jurisdictional statute states in as plain English as Congress ever proffers that the interests of national defense and national security must be accorded due regard in determining whether to award injunctive relief.

This court cannot emphasize more forcefully that no court, least of all this jurist, presumes to dictate to the Marine Corps its assessment of military needs—whether in equipping itself to respond to contingencies or to exigent circumstances in actual theaters of war.  What the Court of Federal Claims should accomplish, however, is an evaluation of a protester's arguments that the showing should be found wanting, and the court proceeds to do so.

The Macecevic Declaration does not justify withholding injunctive relief for two reasons: First, it does not explore available alternatives other than "[s]cavenging [for] parts" or procuring through the DLA, which would mean "up to twice as long till delivery." Macecevic Decl. ¶ 11.  Other alternatives do exist.  Fundamentally, the MCSC wants to procure competitively and fulfill its needs under the competitive contract that formed the basis of Delivery Order 0001.  See Def.'s Br. filed Jan. 20, 2012, No. 81, at 6-7 ("[T]he Marine Corps did much more than that [i.e., investigate a sole-source award] by using the competitive process.").

Second, the MCSC acknowledges that other procurement vehicles, such as a sole-source contact, are available; it just does not want to use them because it is fostering the goals of competition by proceeding on a limited basis with an awardee that would not be in that position absent a material misrepresentation.  On this record the interests of national defense and national security do not prevail over upholding the integrity of the procurement process to redress a material misrepresentation.  The MCSC's preference for a particular procurement scheme is not the same as demonstrating a necessary contractual instrument. Defendant has noted the MCSC's concerns about plaintiff's ability to perform the contract, but the relief awarded does not mandate that the MCSC procure the three systems from plaintiff.  The scope of the injunction prevents fulfilling these particular needs through intervenor and nothing more.

In terms of timing, plaintiff cannot be faulted for delaying the award or delivery of the items sought by the Solicitation.  The record supports a finding that plaintiff has not been dilatory.  In fact, when the court discussed with the parties on December 7, 2011, whether

it would issue a preliminary injunction if plaintiff moved for one to halt the procurement of the $30-million order from intervenor, the court put defendant and the MCSC on notice that it would not entertain a complaint of delay or more aggravated exigent circumstances when briefing, argument, and decision on a consolidated proceeding for preliminary and permanent injunctive relief were scheduled to be completed by late January 2012. See Tr. at 30-35. It is true that plaintiff never moved for preliminary injunctive relief, but, given the rapid and changing developments in this case, including two corrective actions and a retrench from a $47-million procurement to $30 million and then to $9.9 million, all involving different items, plaintiff was in no position to move until the SBA confirmed that intervenor did not qualify to supply a number of components under the Solicitation. When plaintiff came into court, it faced Mr. Macecevic's declaration, which was based on a $30-million draft order for "[e]ssential components and systems with critical deficiencies as of 30 November 2011. This order represents the minimum quantity necessary to achieve satisfactory material readiness for combat units." Macecevic Decl. Ex. 2. (The order had been placed on December 1, 2011, calling for delivery on April 29, 2012, according to defendant's representations during oral argument.)

Faced with that showing and the imminence of resolving the matter on a yet-to-be-briefed record to be supplemented by the documents submitted to, and generated by, the SBA, the court advised that it would not be inclined to grant a preliminary injunction. Therefore, the attempts by both defendant and intervenor to use plaintiff's "failure" to move for preliminary injunctive relief as evidence that plaintiff has not been diligent in pursuing this protest are not looked upon favorably. In fact, given the court's statements to the parties, plaintiff's forgoing the right to move for a preliminary injunction and its advocating an even more expedited briefing schedule on the merits actually weigh in favor of a finding that plaintiff has been doing everything possible to advance its protest to a final decision as quickly as possible—the exact opposite of defendant's and intervenor's contentions.

What occurred in the interim, according to defendant, was that the MCSC issued its order for the $9.9-million truncated procurement as of January 23, 2012, when it canceled that part of Delivery Order 0001 covering components. Defendant insists that the MCSC did not issue a new or revised order; it merely modified the prior order that had been placed on the competitively awarded contract. Therefore, in this particular case, national defense interests should not obviate the defective award.

## CONCLUSION

Accordingly, based on the foregoing,

1. Defendant's motion to dismiss is denied.

2.  Plaintiff's cross-motion for judgment on the administrative record is granted, and defendant's and intervenor's cross-motions for judgment on the administrative record are denied.

3.  Defendant, through the Marine Corps Systems Command, its officers, agents, employees, and all other persons acting in connection therewith shall not proceed with performance of Delivery Order 0001 issued under Contract M67854-11-D-5030 awarded under Solicitation No. M67854-11-R-5030 on July 6, 2011, to J.G.B. Enterprises, Inc., and the contracting officer shall direct J.G.B. to cease performance thereunder.

4.  The Clerk of the Court shall enter judgment declaring the award to intervenor to be unlawful and enjoining performance under Delivery Order 0001 consistent with the foregoing.

5.  By February 17, 2012, the parties shall identify by brackets any material subject to redaction before the order issues for publication.

**IT IS SO ORDERED**.

/s/ Christine O.C. Miller
_____

**Christine Odell Cook Miller**
Judge